**Paul A Clark**
**Clark Legal Service, LLC**
**10 Huron Ave, # 1N**
**Jersey City, NJ 07306**
**(202) 368-5435**
**Faz (201) 336-9105**
**pclark@pclarklegal.com**
**attorney for Plaintiff, Alex Lege**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA
### KETCHIKAN DIVISION

| | |
|---|---|
| ALEX J. LEGE, an individual, | |
| Plaintiff, | |
| vs. | Case No. 20- _____ |
| THE CITY OF KETCHIKAN, a municipal corporation; ROBERT CHEATAM, in his individual capacity; JUSTIN OSTER, in his individual capacity, and LOUIS J. BONETA, JR., an individual, | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

### PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff seeks relief for the violation of his rights secured by 42 USC §1983, §1988, the Fourth Amendment to the United States Constitution, as well as relief for false arrest, malicious prosecution and assault.

2.      The claims arise from a May 7, 2019 incident in which officers of the Ketchikan Police Department ("KPD"), acting under color of state law, intentionally and willfully entered

Plaintiff's home without permission, without a warrant, and with no exigent circumstances; intentionally and willfully proceeded to arrest Plaintiff in his home, without an arrest warrant, and without probable cause; and, while Plaintiff was handcuffed, proceeded to conduct a warrantless search of the premises without a search warrant and without valid permission.

3. Plaintiff seeks monetary damages (special, compensatory) against all Defendants, punitive damages as against Defendants Boneta, Cheatam and Oster, an award of costs and attorneys' fees against all Defendants, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction of the claims herein under 28 U.S.C. § 1331 (claims arising under the United States Constitution) and § 1343(a)(3) (claims to address deprivations, under color of state authority, of rights, privileges and immunities of the United States Constitution). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5. Venue is proper in the District of Alaska because Defendants are located in the District of Alaska because the events giving rise to this cause of action occurred within the District of Alaska. Accordingly, venue is appropriate in this district under 28 U.S.C. § 1391.

## THE PARTIES

5. Plaintiff Alex J. Lege ("Lege") is a citizen of the United States and at all times relevant herein resided in the City of Ketchikan, and State of Alaska.

6. Defendant City of Ketchikan is a municipal corporation organized under the laws of Alaska. At all times relevant hereto, the City of Ketchikan, acting through the Ketchikan Police Department (or "KPD") was responsible for the policy, practice, supervision,

2

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306

implementation and conduct of all KPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all KPD personnel. In addition, at all times here relevant, the City of Ketchikan was responsible for enforcing the rules of the KPD, and for ensuring that the KPD personnel obey the laws of the United States and the State of Alaska.

7.     Defendant Robert Cheatam ("Cheatam") was, at all times here relevant, a police officer of the KPD, and sergeant, and as such, was acting in the capacity of an agent, servant and employee of the City of Ketchikan, and under color of state law, and had supervisory authority over other KPD officers to implement Ketchikan policies and customs.

8.     For purposes of his federal law claims, Plaintiff sues Defendant Cheatam in his individual capacity.

9.      Defendant Justin Oster ("Oster") was, at all times here relevant, a police officer of the KPD, and as such was acting in the capacity of an agent, servant and employee of the city of Ketchikan, and at all times relevant hereto was acting under color of law, and pursuant to policies and practices of City of Ketchikan.

10.     For purposes of his federal law claims, Plaintiff sues Defendant Oster in his individual capacity.

11.     On information and belief, Defendant Louis J. Boneta, Jr., ("Boneta") a private citizen, currently and at all times here relevant, resided in the City of Ketchikan.

## GENERAL ALLEGATIONS

12.     At all relevant times herein, Plaintiff Lege lived in the lower apartment at 743 Harris Street, Ketchikan, Alaska.

3

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
Tel: (201) 360-4080; Fax: (201) 360-4805

13. Boneta and his family live in the upstairs apartment at the same address. The two units each have doors that open onto a common, outside stairway.

14. The incident that forms the basis of this suit and recounted herein is not the first confrontation between Lege and Boneta in which the police were involved. At 1:30 a.m. on April 15, 2019, the Bonetas got into a drunken argument with Lege and instigated a confrontation. During the argument, the Bonetas went down to Lege's apartment and began banging on the door, calling Lege out to fight. Thinking he was outnumbered, Lege obtained a steak knife for protection and opened the door to confront Boneta. Lege did not threaten Boneta with the knife ("there was no assault") and the parties separated with no charges filed.

15. The incident giving rise to this case took place three weeks later, on May 7, 2019. At approximately 9:00 p.m., Cheatam responded to a call at 743 Harris Street reporting that two males (Lege and Boneta) were involved in a dispute. Cheatam's report states that it was Lege who had called the police, and had stated that Boneta had a gun.

16. Cheatam was aware of the confrontation between Lege and Boneta that had taken place three weeks prior.

17. Cheatam arrived to find Boneta, shirtless and intoxicated, standing outside his apartment door on the upper landing, wielding a metal baseball bat. Lege was inside his apartment with the door closed.

18. From the bottom of the stairs, Cheatam requested that Boneta put down the bat; Boneta apparently complied. Cheatam asked Boneta if he had any firearms, Boneta responded in the negative.

19. At no point did Cheatam pose further questions about a firearm, either to Boneta or to any other witness, including Lege.

4

20.     Cheatam then proceeded up the stairs, past Lege's apartment door and up to the entrance of Boneta's apartment where Boneta was standing.  Cheatam did not Mirandize Boneta. Instead, Cheatam and Boneta shook hands, and Cheatam stated that he recognized Boneta as someone he had arrested several times but with whom he had "a good relationship."

21.     Before proceeding further, Boneta suddenly looked angry and pointed down the stairs at Lege who was apparently standing outside of his apartment door. Cheatam turned to Lege and shouted, "Go back inside, *now*."  Lege immediately complied, and Cheatam stated to Boneta, "Sorry about that."

22.     Cheatam did not ask to search Boneta's apartment for a gun nor did he seek a search warrant to do so; Cheatam did not relate to Boneta that he had been reported to have a firearm.

23.      Further, Cheatam did not enter, nor attempt to enter Boneta's apartment at any point during the interview.  In fact, he expressly declined to enter the apartment when Boneta motioned inside, and more than once he made it clear that he wished to remain outside of the apartment during the inquiry.

24.     Boneta is clearly intoxicated and admits that he had been drinking alcohol and smoking marijuana that evening.

25.     Boneta then recounts his version of the incident.  Boneta's story is rambling and incoherent; several times Boneta refers not to the current incident, but to the previous (April 15, 2019) incident between himself and Lege; other of Boneta's comments are indecipherable.

26.     Boneta states that he had been playing dice in his bedroom with his wife, (and also listening to music, drinking, and smoking marijuana) when "the kids knock" on his door.

5

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306

27. Boneta first says that he opened the door and saw Lege "sitting" in his living room. Lege then changes his story and says that he then came out of his bedroom to find Lege standing in his living room with his fists up, ready to fight.

28. Cheatam asked Boneta if Lege said anything; Boneta claimed that Lege had stated "You're a cop caller, you love the cops and I'm gonna . . . fucking get you for it." He further states that he and his wife shoved Lege out of the apartment, but that Lege kept turning and trying to say something.

29. According to Boneta, he and his wife shouted at Lege and shoved him out of the apartment door; once outside, Boneta continued to physically force Lege onto the landing, and physically force him down the stairs.

30. Boneta tells Sgt. Cheatam that when Boneta and Lege were outside the apartment: "I didn't hit him but I'm telling him 'I'm going to whoop your ass. I'm going to whoop your ass.'"

31. A bit later in the interview while continuing to relate the account of Boneta pushing Lege down the stairs, Boneta tells Cheatam "I'm telling him, look Dude, I'm going to whoop-- you know me, I'm not going to back off."

32. Boneta apparently says "you know me" because Boneta has over a dozen criminal convictions, most related to alcohol, including several DUIs. (*See e.g.*, 1KE-14-00045CR, *State of Alaska v. Luois Boneta, Jr*. (felony DUI).

33. Sgt. Cheatam responds "I've arrested you, how many times?"

34. Continuing to relate his version of event to Sgt. Cheatam, Boneta contends that after he forced Lege back down the stairs, Lege stepped into his apartment and came out with a knife.

6

35.     Boneta contended that Lege swiped at him with the knife, and forced him back up the stairs at knifepoint. Boneta stated that when he reached the landing in front of his apartment door, Lege was on the steps just below him, swinging the knife.  At that point, Boneta says he yelled to his thirteen-year-old son Waylon to bring him a baseball bat in order to defend himself. After taking the bat from Waylon, he stood on the landing to prevent Lege from coming any further up the stairs. Boneta then instructed Waylon to call the police.

36.     Boneta claimed that after he armed himself with a metal baseball bat Lege "was still swinging the knife."

37.     Cheatam asked Boneta to describe the knife.   After pausing to think about it for perhaps ten seconds, Boneta responded that he thought it was a kitchen knife, probably the same knife that Lege had used in the incident three weeks prior (when Lege defended himself with a steak knife).

38.     Cheatam then interviewed Waylon (age 13).   Waylon stated that Lege had knocked on the door and walked in.  Boneta, who was present when Waylon was interviewed, commented that it was "the first he heard" that Lege had knocked before entering.

39.     Waylon stated that, after entering, Lege had stated that he needed to speak to Boneta about playing loud music. Cheatam commented that it was too early to complain about loud music, and Boneta agreed.

40.     At this point in the interview Sgt. Cheatam says to Boneta: "You told him to get out" To which Boneta responds "Oh yeah.  Oh yeah.  Mary actually started forcing him out."

41.     Cheatam never asked Waylon if, or when, he brought Boneta the baseball bat. Cheatam did not ask Waylon any question at all regarding the baseball bat.

7

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
Telephone: (201) 355-6365; Facsimile: (800) 603-8205

42.     Cheatam never asked Waylon if he had seen a knife, or whether Boneta had at any time told him that Lege had a knife.

43.     Cheatam also interviewed Boneta's wife Mary.

44.     Boneta tells Sgt. Cheatam "Mary's been drinking."

45.     While waiting for Mary to come outside, Sgt. Cheatam now asked Boneta "So when you told him to get out did he get out?"  Boneta responds "No" and then quickly adds that he and Mary were shoving him out the door, while Lege was trying to talk to them.

46.      Mary was intoxicated, spoke with audibly slurred speech, and became confused during the interview.

47.     Mary stated that it was she, not Boneta, who was the first one out of the bedroom door and that, because of the previous incident, she was "pissed" to see Lege standing there.

48.     Mary stated that Lege was a "bastard" because Lege had "pulled a knife" in the presence of her grandkids.  Cheatam clarified that Mary's was referring to the previous incident, not the current one.

49.     Mary stated that as soon as she saw Lege, she started screaming at him to get out, and immediately began shoving Lege out of the apartment.   She could not recall if Lege had said anything at all.

50.     Mary further stated that "the kids thought we had invited him here."  Sgt. Cheatam just responded "I hear you," and did not follow up as to whether any of "the kids" had actually allowed Lege into the apartment because they thought he had been invited.

51.     Cheatam then questioned Boneta's 16-year-old daughter Vivina, who had been in another room when Lege entered the apartment. Vivina stated that she had come out of her room

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306

to see Boneta and her mother pushing Lege out of the apartment door. Cheatam did not ask Vivina about the baseball bat, or whether she had seen Lege with a knife.

52.     Cheatam asked if there were any other witnesses.  Boneta responded that another female ("Angelina") was present in the apartment but he thought she was in a bedroom the whole time and therefore not a witness to the incident.

53.     Cheatam then stated to Boneta that, unless Lege "has a really different story, I will take him with us tonight, I will take him into custody."

54.     Boneta continued to make threats against Lege telling Sgt. Cheatam:  "if he comes up here again, I'm going to let him in the house and I'm going to smash his f***ing noggin in."

55.     Just prior to Cheatam completing his interview with Boneta, Officer Justin Oster appeared on the landing where Cheatam and Boneta were standing. Cheatam told Oster to go downstairs and talk to Lege.

56.     Cheatam departed less than a minute later. Cheatam's interview with Boneta and his family had lasted for approximately thirteen (13) minutes.

57.     Cheatam then left the upstairs landing and made his way down the stairs to speak with Oster, who had just interviewed Lege.  The door of the apartment was ajar and Lege could be seen standing in his apartment near the open doorway, talking on his cell phone in a low voice.

58.     While standing outside, Oster recounted Lege's version of events to Cheatam. Lege could easily be seen still quietly talking on his phone while Cheatam and Oster were conversing.

59.     Oster related Lege's version of the story thus: Lege had wanted to play some loud music but was concerned about the previous disputes with Boneta.  He stated that Boneta had

9

expressed a wish to "bury the hatchet" with him, and so Lege had decided to go up to Boneta's apartment to make sure that Boneta would have no objections to his music.

60.     Lege stated that when he knocked on the door and asked for Boneta, one of the female residents, not the wife—but another girl wearing black—had let him into the apartment. She indicated that Boneta was in a bedroom and pointed to his door.

61.     Lege stated that the trouble started when, after knocking on the bedroom door, Boneta's wife came out and started screaming at him and shoving him out the door.

62.     Cheatam did not investigate whether Angelina, the un-interviewed female upstairs, could have let Lege into the Boneta apartment.

63.     After listening to Oster's brief recounting of the interview, Cheatam asked if Lege had mentioned anything about a knife. Oster responds, "No."

64.     Cheatam then stated "Let's go in."

65.     Cheatam had listened to Oster for approximately fifty-one (51) seconds.

66.     The two officers then walked into Lege's apartment. Neither Oster nor Cheatam asked permission to enter, nor did they announce their purpose. Lege was still on the talking on his phone as they entered, and can be seen backing away, putting his phone in his pocket, and putting his arms up.

67.     As Oster walks into Lege's apartment, he spots an "open pocketknife" or "utility knife" sitting on a television console near the front door. He picks up the knife and moves it to the far end of a coffee table for purposes of safety.

68.      This is the same knife that was entered into evidence. The knife is a folding utility-type boxcutter, of the type that uses short, replaceable utility blades. It looks nothing like a kitchen knife or a steak knife.

10

69.     Cheatam asks Lege if he has any knives.  Lege, still standing with his arms up, (and unaware that Boneta had accused him of assault with a knife) motions to the kitchen, saying "Over there."  Believing that Oster and Cheatam had wanted to conduct a "wingspan" search to protect their own safety (and because of the previous incident), Lege continues, "if you want to search go ahead . . . I'd rather, I'd rather you be okay and be comfortable."

70.     Neither officer searches (or even moves), and Lege lets his arms drop to his sides and begins speaking, "Here's what happened—" but Cheatam cuts him off: "Alex, Alex, before I talk to you, I've got to cover my bases.  This is called a Miranda warning."

71.     Cheatam then reads Lege his Miranda rights, during which Lege takes out his phone and begins nervously scrolling through messages, shaking his head.

72.     Lege states that he wants to talk to Cheatam after the Miranda warning.  Lege speaks, but Cheatam is demonstrably skeptical of every statement made by Lege; he questions Lege as to whether he (Lege) thought that going up to Boneta's apartment was "a good idea," and appears annoyed.

73.     Lege tries to answer Cheatam's questions but Cheatam's hostility is obvious, and Lege becomes increasingly nervous and halting in his speech.  Finally, Lege indicates that he would rather not speak to Cheatam, and puts his hands behind his back and turns to allow Cheatam to handcuff him.

74.     Cheatam immediately put Lege in handcuffs, stating "You are under arrest for assault in the third degree and criminal trespass one."

75.     While handcuffed, Lege remains in the room with Oster in order to arrange care for his dog.  Cheatam then walks through the apartment and into the kitchen, apparently looking for the knife.  Finding none, he puts Lege in the car and takes him to jail.

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-4468 (facsimile) (201) 266-4305

## POLICY OR CUSTOM ALLEGATIONS

76.     Defendants City of Ketchikan, via the Ketchikan Police Department, Sgt. Robert Cheatam, and Officer Justin Oster, maintain an unofficial custom whereby their police officers are permitted to conduct warrantless arrests of suspects inside their own homes, in clear violation of US Constitution Amendment IV and the clear guidance of the U.S. Supreme Court in *Payton v. New York*.

77.     For years, Ketchikan Police Department has routinely conducted warrantless arrests of suspects in their home without exigent circumstances.

78.     Members of the Alaska Public defender agency in Ketchikan have complained to city officials including the City Attorney about this practice of warrantless arrest in violation of *Payton* but it has continued nonetheless.

79.     Defendants City of Ketchikan, via the Ketchikan Police Department and its failure to investigate and discipline employees and/or deliberate indifference to widespread constitutional violations has resulted in their personnel's use, both repeated and with impunity-- of illegal and unconstitutional trespass into suspect's homes, in clear absence of exigent circumstances, for the purpose of making warrantless arrests and conducting warrantless searches therein.

80.     Defendant City of Ketchikan is deliberately indifferent to the actions of its personnel, in particular those of Cheatam.  Cheatam is known in the local legal community to be abusive of suspects' constitutional rights, to a point that, among public defenders, he is referred to "Officer Cheat-em out of their rights."

81.     Defendant Cheatam has had this reputation for years, but instead of being disciplined, he has been *promoted*—first to Corporal and then to Sergeant.

12

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-0658 (tel.; fax available on request)

82.    Defendant Cheatam has long had a reputation for arresting suspects on minor offenses for which most other officers would only issue a warning or a citation.

83.    The above-mentioned policies, customs or practices are the proximate cause of Plaintiff's injuries.

## DAMAGES

84.    Due to the conduct of Defendants Louis Boneta, Jr., Robert Cheatam, Justin Oster and the City of Ketchikan, as set forth below, Plaintiff Alex J. Lege has suffered the following injuries and damages:

a.  Being wrongfully arrested in front of his community and being incarcerated overnight.

b.  Loss of work due to being arrested, charged, and tried;

c.  Inability to find gainful employment as a consequence of the arrest and detention;

d.  Emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with a felony and facing prison time for a crime that he did not commit, and realizing that the police were utterly indifferent to his innocence;

e.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

f.  Fright, shock, indignity, humiliation and embarrassment of being wrongfully charged and jailed for felonious assault;

g.  Other damages that may be revealed through discovery.

## FIRST CLAIM

### 42 USC § 1983, U.S. Constitution, Amt. IV- Illegal Seizure/Arrest

13

(Against Defendants Cheatam and Oster in Their Personal Capacities)

85.     The preceding paragraphs are here incorporated by reference.

86.     The rights of persons to be free of unreasonable searches and seizures under the Fourth Amendment to the United States Constitution is well established.

87.     That police officers may not conduct a warrantless arrest inside a suspect's home without exigent circumstances is well established.  It is "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, (1980) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 477 (1971)). The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine ... arrest," even for a felony, and even with probable cause. *Id.* at 576.

88.     Any reasonable officer would know that warrantless arrest, absent exigent circumstances, is illegal and violates the rights accorded under the U.S. Constitution.

89.     Defendants, under color of State law, entered Plaintiff's home without permission, without a warrant, and in the absence of exigent circumstances, and arrested Plaintiff.

90.     Defendants failed to intervene in each other's obviously illegal actions.

91.     Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff under 42 USC § 1983.

92.     Plaintiff has been damaged as a result of Defendants' wrongful acts.


**SECOND CLAIM**

**42 USC § 1983, U.S. Constitution, Amt. IV- Illegal Search**
(Against Defendants Cheatam and Oster in Their Personal Capacities)

93.     The preceding paragraphs are here incorporated by reference.

14

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-0468 (tel, facsimile) (201) 266-8105

94.     The rights of persons to be free of unreasonable searches and seizures under the Fourth Amendment to the United States Constitution is well established.

95.     It is well established that a search incident to lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. However, even under this exception, only the person of the arrestee or the area within his control can be validly searched. *Chimel v. California*, 395 U.S. 752, 762-63 (1969).

96.     Any reasonable officer would know that a search incident to a lawful arrest does not permit an officer to search other rooms of the dwelling while the arrestee is handcuffed and with another officer.

97.     Defendants, under color of State law, entered Plaintiff's home without permission and without a warrant; after Plaintiff was arrested and handcuffed, Defendant Cheatam, under color of law, illegally searched other rooms of the apartment for the weapon allegedly used in the alleged assault.

98.     It is also well established that, absent exigent circumstances, law enforcement may not enter the home of a suspect without a warrant, and that a warrantless arrest inside the home is not lawful.  *See Payton v. New York,* 445 U.S. 573 (1980).   Hence, even the exceptions for searches incident to lawful arrest do not apply in this case because Defendant Cheatam's search was incident to an *unlawful* arrest, not a lawful one. Under *Payton v. New York*, Defendants presence in Lege's home was itself unlawful.

99.     Defendant's Oster failed to intervene in Defendant Cheatam's obviously illegal actions.

100.     Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff under 42 USC § 1983.

15

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 668-6834 (Facsimile) (201) 659-6805

101.    Plaintiff has been damaged as a result of Defendants' wrongful acts.


## THIRD CLAIM

### 42 USC § 1983, U.S. Constitution—Municipal and Supervisory Liability
(Against Defendant City of Ketchikan)

102.     The above paragraphs are here incorporated by reference.

103.    Under *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978), local government entities can be liable for the conduct of the police department if that conduct is a part of an officially promulgated policy, or is a custom or practice that is not formally adopted but is pervasive and long-standing, and/or when the when the municipality or police department fails to train officers or employees in the proper conduct.

104.    Defendant City of Ketchikan, by and through its policy-makers, has knowingly created policies, practices and customs, including a failure to provide adequate training to its police officers, including the individual Defendants, regarding the police department's constitutional obligation to arrest an individual only with probable cause, and to refrain from entering an individual's home for the purpose of arrest, without first having an arrest warrant, consent of the homeowner, or exigent circumstances; all of which demonstrate "deliberate indifference" to the constitutional rights of its citizens.

105.    Defendant City of Ketchikan's deliberate indifference and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

106.    Defendant City of Ketchikan is liable for the damages suffered by Plaintiff as a result of the conduct of its policy or custom under which unconstitutional practices occurred, particularly in regard to warrantless arrests inside the homes of suspects.

16

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-4688 (facsimile) (201) 798-5305

107.     The Fourth Amendment violations described above are not isolated incidents in Ketchikan. The City of Ketchikan has exhibited deliberate indifference to KPD's repeated use of warrantless entries and false arrests, and that deliberate indifference caused the violation of Plaintiff's constitutional rights in this case, and in many, many others.

108.     Indeed, Sgt. Robert Cheatam is known in the local legal community to be abusive of suspects' constitutional rights, to a point that, among public defenders, he is referred to "Officer Cheat 'em out of their rights."

109.     The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite that awareness, the City of Ketchikan has failed to take corrective action.

110.     Plaintiff has been damaged as a result of the deliberate indifference of the City of Ketchikan.

111.     Defendant City of Ketchikan is further liable for any other acts of constitutional violations that may be uncovered in the discovery process.


### FOURTH CLAIM

**Common Law False Detention/Arrest**
(As Against Defendants Cheatam and Oster in Their Personal Capacities)

112.     The preceding paragraphs are incorporated by reference.

113.     Defendants, acting or purporting to act in performance of their official duties as law enforcement officers, falsely detained/arrested Plaintiff without a warrant and without probable cause.

17

114. Defendants actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiff 's constitutional rights, or were performed in a wanton and oppressive manner.

115. As a direct and proximate result of Defendants actions and inactions, Plaintiff suffered injuries and damages entitling him to receive compensatory and punitive damages against Defendants Cheatam and Oster.

## FIFTH CLAIM

### Common Law Malicious Prosecution
(As against Defendant Boneta, and against Cheatam in his Personal Capacity)

116. The preceding paragraphs are incorporated by reference.

117. Defendant Boneta communicated to a Police Officer material information that was false, fabricated, or inaccurate, thus initiating criminal proceedings against Plaintiff in the Alaska state court without probable cause.

118. The criminal proceedings ultimately terminated in Plaintiff's favor, with a jury acquitting Plaintiff after a trial.

119. The jury returned a not guilty verdict on both counts in about ten minutes.

120. Defendants' actions and inactions were motivated by evil motive or intent, malice, or for a purpose other than bringing a perpetrator to justice.

121. As a direct result of Defendant Boneta's false and inaccurate statements and or omissions, Plaintiff was arrested, jailed and prosecuted for a crime or crimes he did not commit.

122. Sgt. Cheatam signed the criminal complaint against Lege that officially commenced the prosecution.

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-0486 facsimile (201) 604-6005

123. The criminal Complaint sworn to by Sgt. Cheatam contained a probable cause statement that follows:

> Probable Cause Statement: This complaint is based on the statement of Louis Boneta Jr. as made to Sgt. Cheatam, Ketchikan Police Department, that he came out of his bedroom and saw the defendant standing next to the door in a fighting stance; further Mr. Boneta had to physically force the defendant out of his apartment when the defendant refused to leave; further Mr. Boneta was walking down the stairs with the defendant when the defendant stepped into his own apartment, came back out with a knife and swung the knife at Mr. Boneta trying to strike him while forcing Mr. Boneta backwards upstairs to his own porch; all of which placed Mr. Boneta in fear of being stabbed; further W.P., age 13, said the defendant-knocked on Mr. Boneta's. apartment door-then walked in without permission;--Further, W.R. gave a bat to Mr, Boneta to defend himself while the defendant was still trying to strike him; further Sgt. Cheatam located an open utility knife inside the defendant's residence just to the left of the entry door.

124. Sgt. Cheatam must have known that Boneta's version of events was highly questionable and contradicted by the physical evidence.

125. Assault in the Third Degree (AS 11.41.220) occurs when a defendant recklessly "places another person in fear of imminent serious physical injury by means of a dangerous instrument."

126. Sgt. Cheatam's own investigation, including his illegal search confirmed that there was no knife matching Boneta's description, but Cheatam continued with the arrest and prosecution of Lege anyway.

127. Moreover, even Boneta admitted that after he shoved Lege out of the apartment, that Boneta continued to force Lege onto the landing, and down the stairs until he and Lege were in front of Lege's apartment. Certainly, once Lege was out of the apartment, Boneta had no privilege or right to continue pushing Lege all the way down the stairs. Even on Boneta's version of events this was an assault by Boneta against Lege.

19

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(192) Defendant Facsimile (201) 205

128.    Moreover, even under Boneta's version of event, Boneta admits that he repeatedly threatened Lege outside of Boneta's apartment with  immanent attack telling him "I'm going to whoop your ass" and arming himself with a deadly weapon, a baseball bat.

129.    As to the trespass allegation, the only witness who Cheatam interviewed who was allegedly present when Lege entered the apartment stated that Lege had "knocked on the door and walked in" and that Lege had stated that "he needed to speak to Boneta about playing loud music."  The allegation was that Lege then knocked on Boneta's bedroom door after which Lege was immediately forced out of the residence (apparently within a matter of seconds).

130.    Mary stated that it was she was the first one out of the bedroom and she immediately began shoving Lege out of the apartment, while screaming at him.  Mary could not recall if Lege had said anything.  Clearly, under Mary's account of events, Lege had never been asked to leave, nor given a chance to explain why he was there.  Hence,  even under the account of the so-called victims, it was Mary and Boneta who physically forced Lege out of the apartment without asking him to leave.

131.    The above allegations as set forth by members of Boneta's own family do not support a plausible claim for trespass.

132.    Of course, Boneta appeared to insist that Lege had not knocked on the door at all, although he admitted he was not even present initially.  Further, given Boneta's level of intoxication, in combination with music playing loudly, he would not have heard any knock.

133.    In short, Boneta concocted false allegations against Lege, and Sgt. Cheatam maliciously commenced prosecution of Lege despite the fact that any reasonable person would have known that there was no basis for prosecution.

20

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(201) 266-6468 (fax simile) (201) 266-5595

134. As a direct and proximate result of Boneta's actions and inactions, Plaintiff was charged with crimes he did not commit, and suffered the injuries and damages set forth above.

135. As a direct and proximate result of Cheatham's actions and inactions, Plaintiff was charged with crimes he did not commit, and suffered injuries and damages set forth above.

## SIXTH CLAIM

### Common Law Assault & Battery
(as Against Defendant Boneta)

136. The preceding paragraphs are incorporated by reference.

137. After Lege was permitted into Boneta's residence, Boneta began to threaten Lege with physical battery.

138. Although Lege had knocked on the door, and one of Boneta's family members had allowed Lege to enter the apartment, Mary began screaming at Lege as soon as she opened the bedroom door.

139. Just before Boneta emerged from the bedroom following Mary, Lege heard Boneta say something to the effect of "Get my gun, I'm going to take care of this guy."

140. Lege knew that Boneta was a convicted felon and not permitted to own a gun, but Lege did not know if Boneta was serious or bluffing.

141. Defendant Boneta, having no privilege to do so, intentionally pushed and shoved Defendant causing harmful and offense contact.

142. After Boneta began threatening Lege in Boneta's apartment, Lege left the apartment and followed his dog down the stairs to the street in front of the apartment building.

143. Boneta followed Lege down the stairs to the street repeatedly threatening Lege saying in an angry voice "I'm going to whoop your ass. I'm going to whoop your ass."

21

144.    After repeatedly shouting threats at Lege, Boneta went back up the steps in front of his apartment door and called out to his son to bring him a baseball bat.

145.    Boneta's teenage son came out of the residence and handed Boneta a metal baseball bat.

146.    Lege quickly went into his own residence locked the door and called the police.

147.    The actions by Boneta described above did cause, and were intended to cause, harmful and offensive contact to Lege.

148.    The actions by Boneta described above placed Lege in imminent apprehension of harmful and offensive contact and/or physical injury, and were intended to do so.

**WHEREFORE,** Plaintiff Alex J. Lege respectfully seeks judgment against the defendant, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of

plaintiff's causes of action;

B. Awarding to Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this

action; and

D. Granting such other and further relief as this Court deems just and proper.

Dated May 7, 2020                            Paul A. Clark
                                             Clark Legal Service, LLC
                                             Attorneys for  Alex Lege

                                             By: /s/   Paul A. Clark____
                                             Paul A. Clark, Alaska Bar # 0611102

Clark Legal Service, LLC
10 Huron Ave, Suite 1N; Jersey City, NJ 07306
(302) 299-6463 facsimile (302) 341-6005