**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALEX LEGE,                          )
                                    )
                    Plaintiff,      )
                                    )
    vs.                             )
                                    )
CITY OF KETCHIKAN, et al.,          )
                                    )      No. 5:20-cv-006-HRH
                    Defendants.     )
_____)

O R D E R

Motion for Summary Judgment

Defendants Robert Cheatam, Justin Oster, and the City of Ketchikan move for summary judgment on all of plaintiff Alex Lege's claims.[1]  This motion is opposed.[2]  Oral argument has not been requested and is not deemed necessary.

Background

In May of 2019, plaintiff Alex Lege lived in an apartment in Ketchikan, Alaska. Defendants Robert Cheatam and Justin Oster were officers of the Ketchikan Police Department.  Defendant City of Ketchikan employed Officers Cheatam and Oster. Defendant Louis Boneta, Jr., resided in an apartment in the same building with plaintiff.

In his amended complaint, plaintiff Alex Lege alleges that in May 2019, officers of the Ketchikan Police Department (Robert Cheatam and Justin Oster) illegally entered his

---

[1]Docket No. 39; Reply at Docket No. 57.

[2]Docket No. 51.

home, searched it, and arrested him.[3]  Lege claims that the officers failed to obtain either

an arrest or a search warrant, failed to obtain permission to enter his house and "valid

permission" to search it, lacked probable cause for the arrest, and that there existed no

exigent circumstances that otherwise permitted a warrantless entry into his home.[4]  Lege

claims that Officers Oster and Cheatam's actions constitute violations of 42 U.S.C.

§ 1983 and of the Fourth Amendment of the United States Constitution's prohibition

against illegal searches and arrests, and constituted common law malicious prosecution

and common law false arrest.[5]

Both Officers Cheatam and Oster wore body cameras that recorded this  encounter.[6]  The 911 calls that initiated the police response were also recorded.  Collectively, the

recordings and other evidence in the record[7] show that on May 7, 2019, Officers

Cheatam and Oster responded to 911 calls placed by Lege and by his neighbor, Louis

---

[3]Amended Complaint at 1-2, ¶¶ 2-3, Docket No. 9.

[4]Id.

[5]Id. at 13-21, ¶¶ 85-135.

[6]Defendants have supplied transcripts of the dialogue in these videos as exhibits to their motion for summary judgment.  Lege argues that the transcripts contain errors and should therefore be excluded.  He cites no legal basis for exclusion.  Defendants contend that these transcripts are properly before the court and that to the extent they differ in certain respects from the video recordings, then the video should control.

Defendants' argument is persuasive.  The court can properly refer to both the recordings and the transcripts and identify any discrepancies.  The recordings control where any differences exist.  See United States v. Rinn, 586 F.2d 113, 118 (9th Cir. 1978) (district court did not err when it submitted tape recordings and government's prepared transcripts thereof to jury, subject to instruction that transcripts were only to be used as an aid to following the tapes, and tape recordings, not transcripts, controlled).

[7]The record also contains various police reports, including for events other than the one here at issue, the complaint and transcripts of trial testimony in the criminal prosecution initiated as a result of these events, excerpts from Lege's deposition, the transcript of Lege's 911 call, and affidavits from Oster and Cheatam.

ORDER – Motion for Summary Judgment                                                - 2 -

Boneta's son. Boneta's son, W.P., reported that his dad was going to "beat up the downstairs neighbor."[8] W.P. stated that his father was yelling but that he had no weapons, and that Lege also had no weapons.[9] Yelling is audible in the background.

In a separate call, Lege told the dispatcher that his upstairs neighbor had tried to get Lege into the neighbor's apartment.[10] Lege stated that Boneta then came out with a gun and threatened him, which prompted Lege to run back to his own apartment.[11] He also stated that a female, possibly Boneta's daughter, had invited him into Boneta's apartment.[12] As Lege speaks with the dispatcher, he stated that he has his workplace X-Acto knife on him and that Boneta was standing outside his locked apartment, knocking on the door and calling him names.[13] During the call, the dispatcher told Lege not to open his door, as officers were en route.[14] At the end of the call, the dispatcher then told Lege that officers were now there and to stay inside until they contacted him.[15] When the officers arrived and contacted the various witnesses, it became apparent that all of the

---

[8]Exhibit 2, W.P. 911 call at 00:15-0:41, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-2.

[9]Id. at 0:50-0:59, 1:40-1:43.

[10]Exhibit 1, Lege 911 call at 0:00-0:19, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-1.

[11]Id. at 0:00-0:25, 1:57-2:10.

[12]Id. at 1:52-1:55.

[13]Id. at 0:40-1:17.

[14]Id. at 1:14-1:17.

[15]Id. at 2:21-2:27.

adults had consumed substances that evening. Boneta admitted to having consumed marijuana and alcohol.[16] Lege told Officer Oster that he was "a little tipsy."[17]

Officer Cheatam, upon arrival at the apartment building, first contacted Boneta outside his apartment.[18] Almost as soon as Officer Cheatam arrived, Boneta started staring down the stairway and pointing.[19] Officer Cheatam yelled, "go back inside, now."[20] The camera does not show the person to whom the men are speaking, though this was presumably Lege. Boneta then began his conversation with Officer Cheatam by mentioning that there was an incident several weeks prior involving Lege, Lege's romantic partner, and Boneta where the police had also been called.[21] Officer Cheatam replied that he was aware of that incident.[22]

Boneta twice described to Officer Cheatam what happened with Lege earlier that evening: Boneta first provided his statement while on his apartment landing, outside the arctic entry/mud room that leads to his apartment interior, and once again after they go inside that outer entryway. Boneta explained that earlier that evening, he exited his

---

[16]Exhibit 4, Officer Cheatam body camera footage at 3:20-3:32, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-4.

[17]Exhibit 3, Officer Oster body camera footage at 8:58-9:02, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-3. See also Exhibit A, Lege deposition at 9-10, Defendant's Motion for Summary Judgment, Docket No. 39-1.

[18]Exhibit 4, Officer Cheatam body camera footage at 1:10, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-4.

[19]Id. at 1:19-1:25.

[20]Id. at 1:24-1:25.

[21]Id. at 1:30-1:44.

[22]Id. at 1:33-1:35.

ORDER – Motion for Summary Judgment                                           - 4 -

bedroom and saw Lege standing in his living room.[23]  Boneta stated that Lege started

"going off," that Lege called Boneta a "cop caller" and told Boneta that he was going to

"get [him] for it," and that Lege asked Boneta if he wanted to "get busy."[24]

Boneta explained that he told Lege to get out, but that Lege did not leave.[25]

Boneta stated that he and his wife had to push Lege out of their apartment, but that Lege

kept trying to turn around and talk to them as they attempted to force him out.[26]  Boneta

further explained that he then forced Lege off his stoop and down the stairs to Lege's

apartment.[27]  He stated that Lege then retrieved a knife and began to swing it at him, tried

to stab him, and that Lege then used the knife to walk him up the stairs.[28]  Boneta stated

that he was scared of the knife.[29]  He explained that the knife looked like a kitchen knife,

but not like a buck knife or a hunting knife, and that it was probably the same one that

Lege had used against him in a prior incident.[30]  He stated that he then asked his son,

W.P., for a baseball bat and told him to call the police.[31]  Boneta further explained that

---

[23]Id. at 1:46-1:55, 3:37-3:50.

[24]Id. at 1:55-2:15, 5:22-5:28.

[25]Id.  at 8:42-8:48.

[26]Id. at 8:42-8:54, 9:55-10:05.

[27]Id. at 2:07-2:17, 4:00-4:22.

[28]Id. at 2:17-2:30, 4:22-4:26.

[29]Id. at 7:11-7:20.

[30]Id. at 6:06-6:30.

[31]Id. at 4:26-5:01.

ORDER – Motion for Summary Judgment                                        - 5 -

after he got back up to his landing and received the bat, Lege was at that point back up by his apartment, and that Lege continued to swing his knife.[32]

Officer Cheatam then interviewed several other individuals who also lived in Boneta's apartment. W.P. stated that when Lege came up to the apartment, he knocked on the door and then walked in on his own.[33] He stated that no one had answered the door for Lege.[34] W.P. stated that Lege had said that he needed to talk to Boneta about playing music.[35] Boneta's wife, Mary, also stated that she pushed Lege out of her apartment after she saw him in her living room, and that she told him to never come up there again.[36] She explained that several weeks prior, Lege had pulled a knife in front of her grandchildren.[37] V.P. stated that she observed Mary and Boneta pushing Lege out of the apartment.[38] V.P. stated that Lege had come in without knocking.[39] Boneta further explained that another female was in an apartment bedroom during the duration of the encounter.[40]

---

[32]Id. at 5:00-5:10.

[33]Id. at 7:50-8:08.

[34]Id. at 8:00-8:08.

[35]Id. at 8:08-8:25.

[36]Id. at 10:10-10:47.

[37]Id. at 10:45-11:07.

[38]Id. at 11:54-12:00.

[39]Id. at 12:44-12:55.

[40]Id. at 12:38-12:44.

ORDER – Motion for Summary Judgment

- 6 -

Officer Oster also responded to the incident. Upon arrival at the apartment building, he contacted Lege at his apartment.[41] Lege's apartment is located on a landing, up two sets of stairs.[42] The footage of Officer Oster walking up to Lege's apartment is dark and shaky. There is either an additional stair step up from the landing area to Lege's doorway or a gap between the landing and his front door.[43] Officer Oster knocked on the apartment door and waited outside until Lege opened it.[44] While standing outside the doorway, Officer Oster said, "Alex hey, Officer Oster."[45] Lege, standing inside the apartment, in front of the doorway, stated that he just called.[46] Officer Oster instructed Lege to take a step back, and Lege raised his hands and stepped back from the doorway, further into his apartment.[47] At this point, it appears that Officer Oster took a step forward and somewhat upwards, but remained in the doorway, outside the apartment.[48] Whereas the video showed Officer Oster previously standing outside the doorway, the video here shows him moving into the doorway frame, but toward the back end, hinged corner of the open door.

---

[41]Exhibit 3, Officer Oster body camera footage at 0:49-0:55, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-3.

[42]Id. at 0:33-0:46.

[43]Id. at 0:45-0:47. See also Exhibit A, Lege deposition at 1, Defendant's Motion for Summary Judgment, Docket No. 39-1. At his deposition, Lege stated that "there's no step in between the stairs and the house itself." However, this is not clear in the video.

[44]Id. at 0:50-0:57.

[45]Id. at 0:55-0:57.

[46]Id. at 0:56.

[47]Id. at 0:57-0:58.

[48]Id.

ORDER – Motion for Summary Judgment                                      - 7 -

Officer Oster then asked Lege if he can come inside.[49]  Lege said yes, and Officer Oster appears to step up a bit further as he entered the apartment.[50]  The full length of the doorway frame, including the ground, is not visible during this initial encounter.[51]  It is therefore difficult to discern where exactly Officer Oster is standing in the doorframe throughout this initial encounter.  However, the video shows that Officer Oster remained in the doorway area until Lege told him he could come inside.  He did not fully step up and move past the door frame, then the door, and into the apartment, until Lege told Officer Oster that he could come inside.[52]

Lege then told Officer Oster that he went up to Boneta's apartment to ask if he would mind if he played music.[53]  Lege explained that a female in a dark colored shirt opened the second door to the inside of the apartment and took him into a living room.[54]  Lege stated that this incident is similar to a prior incident involving Boneta:  "This is the same damn thing.  The same gun, the same [indiscernible], the same thing as last time. . . .  The same ummm idea of, oh you called the cops, oh you brought a knife."[55]  Lege has a difficult time staying on topic, that is, staying focused on the events of the then current evening.

---

[49]Id. at 0:58-0:59.

[50]Id. at 0:59-1:01.

[51]Id. at 0:56-1:01.

[52]Id.

[53]Id. at 1:01-9:57.

[54]Id. at 1:25-2:30, 8:48-9:38.

[55]Id. at 2:54-3:07.

ORDER – Motion for Summary Judgment                                   - 8 -

Lege explained how Boneta and his wife then came out of the bedroom, into the living room, and an argument ensued.[56] Lege stated that he went straight outside.[57] At one point, Officer Oster asks if anyone had said anything about a gun.[58] Lege stated that Boneta had a gun and had mentioned a gun, that he himself only had his work knife, and told Officer Oster that he could search his apartment.[59] The knife must have been in plain view somewhere in the vicinity, as both Officer Oster and Lege acknowledged its location, though it is not visible on camera.[60] Throughout the interview, Lege was visibly intoxicated, appeared extremely anxious, and had difficulty staying on subject. His story is difficult to follow. When Officer Oster asked why Lege called the police, Lege responded, "because I can't keep getting called without saying something."[61] Lege showed Officer Oster a text message from Boneta about "bury[ing] the hatchet," which he said that he had received one week prior and ignored.[62]

After finishing his conversation with Lege, Officer Oster told Lege to hang out and proceeded to exit the apartment.[63] As Officer Oster walked out the front door, Lege

---

[56]Id. at 2:28-4:25.

[57]Id. at 4:19-4:20.

[58]Id. at 5:58-6:01.

[59]Id. at 5:58-6:16.

[60]Id. at 6:10-6:14.

[61]Id. at 6:50-7:20.

[62]Id. at 7:30-8:30.

[63]Id. at 9:56-10:07.

ORDER – Motion for Summary Judgment                                          - 9 -

told him that he could "keep that open" and Officer Oster replied that he will leave it cracked.[64]

As Officer Oster began to walk up the stairs to Boneta's apartment, he told Lege to go inside.[65] Officer Oster then went to Boneta's apartment, where Boneta and his wife are speaking with Officer Cheatam.[66] Officer Cheatam sent Officer Oster back downstairs not long after he arrived; Officer Oster returned to the doorway outside of Lege's apartment less than two minutes after he had initially left.[67] Lege's apartment door is still open, and Oster pushes it slightly further open upon his return.[68]

Lege is on the phone and sees Officer Oster standing outside.[69] Officer Oster informed Lege that he is waiting for his sergeant.[70] Officer Cheatam arrives not long after and Officer Oster relayed Lege's story to him.[71] He did not tell Officer Cheatam that Lege had previously given him permission to come inside or to search his apartment. All the while, Lege was on the phone, standing by his open doorway, and he eventually begins to lean against his open door.[72] Officer Cheatam asked if Lege had said anything

---

[64]Id. at 10:05-10:10.

[65]Id. at 10:17-10:20.

[66]Id. at 10:30.

[67]Id. at 11:37-11:51.

[68]Id. at 11:46-11:52.

[69]Id. at 11:58-11:59.

[70]Id. at 12:00-12:02.

[71]Exhibit 4, Officer Cheatam body camera footage at 14:28-15:20, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-4.

[72]Id.

ORDER – Motion for Summary Judgment                                          - 10 -

about a knife, and Officer Oster responds that he did not.[73]  Officer Cheatam says, "let's go in."[74]  They then enter the apartment as Lege backs away from the doorway, raises his hands, and concludes his phone conversation.[75]  Lege pointed in the direction of his knife and said, "you understand where my stuff is, go ahead."[76]

Officer Oster showed Officer Cheatam a knife near the doorway and explained that it is the only knife he found.[77]  The knife is later seized and placed into evidence.[78]  Officer Cheatam asked Lege if he had any kitchen knives, and Lege motioned toward his kitchen and told Officer Cheatam that he would prefer that the officers "be ok and be comfortable," if they wanted to search him.[79]  After being Mirandized, Lege tells the officers that he "thought [he] called [them]" and that he wanted to talk with them.[80]

Lege again stated that he had gone upstairs and knocked on the door.[81]  Lege explains that one or two weeks prior, he had received a text message from Boneta asking

---

[73]Id. at 15:15-15:18.

[74]Id. at 15:18-15:20.

[75]Id. at 15:20-15:22.

[76]Id. at 15:17-15:23.

[77]Exhibit 3, Officer Oster body camera footage at 13:24-13:30, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-3.

[78]Exhibit 6, police reports and charging documents at 8, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-6.

[79]Exhibit 4, Officer Cheatam body camera footage at 15:27-15:36, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-4.

[80]Id. at 16:30-16:38, 17:23-17:28.

[81]Id. at 19:23-19:37.

ORDER – Motion for Summary Judgment                                                 - 11 -

if they could "bury the hatchet" but that he had ignored it.[82] Lege showed Officer Cheatam the message.[83] Lege again stated that Boneta had previously told him, weeks prior, that he could just come inside if Boneta was playing his music too loud.[84] As Officer Cheatam attempts to interview Lege, Lege told him that he would prefer if they just took him then.[85] Officer Cheatam then handcuffs Lege and informs him that he was under arrest for third-degree assault and first-degree criminal trespass.[86] Officer Cheatam then walks into the kitchen, spends less than thirty seconds looking around, and walks out.[87]

Based upon the above-described incident, Lege commenced this lawsuit against the defendants, Officers Cheatam and Oster and the City of Ketchikan, based on alleged violations of 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.[88] In his "first claim," plaintiff alleges that Officers Cheatam and Oster, acting in their individual capacities, made an unlawful, warrantless arrest of plaintiff based upon the officers' non-consensual entry into plaintiff's home.[89] Lege's "second claim," also against both officers in their individual capacities, alleges that the officers unlawfully entered his home without permission and without a warrant for purposes of a search of his

---

[82]Id. at 17:40-17:46, 18:36-19:20.

[83]Id. at 18:50-19:17.

[84]Id. at 19:55-20:10.

[85]Id. at 21:20-21:23.

[86]Id. at 21:22-21:30.

[87]Id. at 21:51-22:10.

[88]Docket Nos. 1 (Complaint) and 9 (Amended Complaint).

[89]Amended Complaint at 13-14, ¶¶ 85-92, Docket No. 9.

apartment.[90]  Lege's "third claim," against the City of Ketchikan, alleges that the City operated a police department which had promulgated a policy or a custom and practice that provided inadequate training to police officers as regards their obligation to make arrests only upon probable cause, and to refrain from entering private residences for purposes of an arrest without first having either a warrant or the consent of the homeowner based upon <u>Monnell v. Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978).[91]  Lege's "fourth claim," against Officers Cheatam and Oster in their individual capacities, alleges common law false arrest.[92]  Lege's "fifth claim" alleges that Boneta and Officer Cheatam in his individual capacity committed the common law offense of malicious prosecution.[93] Lege's "sixth claim" is against defendant Boneta, who has been defaulted.[94]  Defendant Boneta is not a party to the motion for summary judgment.

In answering, and in reliance upon the video recordings of the events, defendants Officer Cheatam, Officer Oster, and the Ketchikan Police Department largely deny Lege's characterization of the events in question, as set forth in his amended complaint.[95] In answering, defendants also raise several affirmative defenses:  absolute immunity,

---

[90]<u>Id.</u> at 14-16, ¶¶ 93-101.

[91]<u>Id.</u> at 16-17, ¶¶ 102-111.

[92]<u>Id.</u> at 17-18, ¶¶ 112-115.

[93]<u>Id.</u> at 18-21, ¶¶ 116-135.

[94]Docket No. 23.

[95]<u>See</u> Answer at 3, ¶ 20, Docket No. 22.

ORDER – Motion for Summary Judgment                                              - 13 -

qualified immunity, and consent to entry into Lege's apartment.[96]  As for the knife seized by the police officers, they contend that Lege pointed them to the knife.[97]

At his deposition, Lege initially stated that Officer Oster did not ask permission to enter his apartment until "he had already firmly planted both feet inside [his] residence."[98] However, later in the deposition Lege stated that Officer Oster was just "mid-stride" and that he now could not "recall saying firmly planted inside [his] apartment."[99]  Additionally, both Officers Cheatam and Oster submitted affidavits in the course of this case. Officer Oster averred that he has no malice toward Lege and that he did not act out of malice.[100]  Officer Cheatam averred that he also has no malice toward Lege and that he did not act of malice.[101]

Defendants Cheatam, Oster, and the City of Ketchikan now move for summary judgment on all of Lege's claims.[102]

<u>Discussion</u>

Under Rule 56(a),  Federal Rules of Civil Procedure, the court grants summary judgment to a moving party if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving

---

[96]<u>Id.</u> at 15, ¶¶ 1-3.

[97]<u>Id.</u> at 15, ¶ 3.

[98]Exhibit A, Lege deposition at 3, Defendants' Motion for Summary Judgment, Docket No. 39-1.

[99]<u>Id.</u> at 12.

[100]Exhibit D, Officer Oster affidavit at 2, ¶ 8, Defendants' Motion for Summary Judgment, Docket No. 39-4.

[101]Exhibit G, Officer Cheatam affidavit at 2, ¶ 6, Defendants' Motion for Summary Judgment, Docket No. 39-7.

[102]Docket No. 39.

party bears the initial burden to show that there exist no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party satisfies this initial burden, then the opposing party must set forth specific facts showing that there exists a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The opposing party cannot rely on just allegations or denials in the pleadings. Id. at 248. A moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the party's case and for which that party bears the burden of proof. Celotex Corp, 477 U.S. at 323.

The existence of some factual dispute between the parties will not preclude entry of summary judgment. Anderson, 477 U.S. at 247-48. The requirement is that there exists no genuine issue of material fact. Id. Only disputes about facts that might affect the outcome of the suit may properly preclude entry of summary judgment. Id. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. If there exists a genuine dispute as to the facts at issue, the court must view such facts in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 380 (2007).

The Fourth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, proscribes "unreasonable searches and seizures." Police cannot make a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest, even if probable cause exists. Payton v. New York, 445 U.S. 573, 576, 586-88 (1980). While a search incident to arrest is proper under the Fourth Amendment, the scope of such a search is limited to the person of the arrestee and the area within that person's immediate control, even if the arrest occurs in

the arrestee's home.  <u>Chimel v. California</u>, 395 U.S. 752, 762-63, 768 (1969).  Such a search is not a license to search any room other than that in which the arrest occurs.  <u>Id.</u>

Section 1983 of Title 42, United States Code, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ."  To state a Section 1983 claim, a plaintiff must show the following:  "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law."  <u>Bluel v. Cottle</u>, No. 3:17-cv-0116-HRH, 2019 WL 302484, at *8 (D. Alaska Jan. 23, 2019) (quoting <u>Long v. Cnty. of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006)).

Plaintiff claims that his rights secured by the Constitution of the United States have been violated.  It is undisputed that the alleged violations were committed by persons acting under color of state law.  The questions before the court are whether the facts as set out above do or do not establish the constitutional violations which are asserted.

A.    <u>Lege's Claim of Illegal Arrest</u>

Lege claims that his Fourth Amendment rights were violated when the defendant officers entered his home without permission, a warrant, or exigent circumstances, and thereafter arrested him.[103]  It is undisputed that plaintiff was arrested by Officers Oster and Cheatam in his residence.  It is undisputed that the officers did not have a warrant for

---

[103]Amended Complaint at 13-14, ¶¶ 85-92, Docket No. 9.

ORDER – Motion for Summary Judgment                                              - 16 -

plaintiff's arrest, nor is it claimed that there were exigent circumstances justifying a warrantless arrest. The issue which divides the parties is the question of whether or not Officers Oster and Cheatam had the requisite consent for their entry into plaintiff's apartment.

Defendants contend that they are entitled to summary judgment because Lege consented to their entry into his home.[104] They argue that the body camera footage shows that Officer Oster waited outside his apartment until Lege told him that he could enter.[105] Lege argues that Officer Oster's body camera footage does not show the precise location of his body and that certain unspecified details suggest that he was part of the way inside, or halfway through the doorway with his foot or body "halfway into the dwelling in a manner that prevented closure of the door," when he requested entry.[106] The parties disagree as to whether a doorway is a public space; and Lege contends that even if Officer Oster's first entry was valid by reason of consent, his and Officer Cheatam's second entry was not.[107] It is undisputed that Officer Oster, upon arriving at plaintiff's apartment, asked Lege, "Can I come in?"[108] Lege said, "Yeah, go ahead," and then proceeded to talk about his dog.[109] Plainly, consent was given. The material question is whether or not

---

[104]Defendants' Motion for Summary Judgment at 6-9, Docket No. 39.

[105]Id. at 8.

[106]Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 10-13, Docket No. 51.

[107]Id. at 13.

[108]Exhibit 3, Officer Oster body camera footage at 0:58-0:59, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-3.

[109]Id. at 0:59-1:01.

ORDER – Motion for Summary Judgment                                                    - 17 -

Officer Oster entered plaintiff's apartment before seeking and receiving plaintiff's consent.

The Fourth Amendment applies when one has a reasonable expectation of privacy in the place invaded. Espinosa v. City and Cnty. of San Francisco, 598 F.3d 528, 533 (9th Cir. 2010) (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," unless an exception to the warrant requirement applies, such as exigency or consent. Id. at 586 (footnote omitted) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 477-78 (1971)); see also Steagald v. United States, 451 U.S. 204, 214 n.7 (1981) ("[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant."). Here, there were no exigent circumstances justifying a warrantless arrest. Again, the question is whether consent was obtained by Officer Oster before he entered plaintiff's apartment.

A consenting person may delimit or withdraw consent at any time, and a consensual search that exceeds the scope of consent given violates the Fourth Amendment. United States v. McWeeney, 454 F.3d 1030, 1034 (9th Cir. 2006). Consent to search cannot be validly qualified by the number of officers allowed to search because once consent has been obtained, any expectation of privacy is lost and the entry of additional officers does not further diminish any expectation of privacy. United States v. Rubio, 727 F.2d 786, 797 (9th Cir. 1983).

ORDER – Motion for Summary Judgment                                                    - 18 -

When an individual is standing in the doorway of his or her house, that person is "in a 'public place' for purposes of the Fourth Amendment." United States v. Santana, 427 U.S. 38, 38 (1976). See also United States v. Carrion, 809 F.2d 1120, 1128 (9th Cir. 1987) (no reasonable expectation of privacy at open hotel door); United States v. Botero, 589 F.2d 430, 432 (9th Cir. 1978) (acknowledging that the Santana court considered the doorway a public place). This is so because this is not an area where one has any expectation of privacy and is as "exposed to public view, speech, hearing, and touch as if [one is] . . . standing completely outside [one's] house." Santana, 427 U.S. at 42. Thus, an arrest made in this location is an arrest in a public place. Id. See also LaLonde v. Cnty. of Riverside, 204 F.3d 947, 955 (9th Cir. 2000) ("The Fourth Amendment's prohibition on warrantless entry into an individual's home does not apply to arrest made at the doorway, because the doorway is considered a public place."). But once the threshold of the door is crossed, this prohibition applies. See LaLonde, 204 F.3d at 955.

Here, the defendants claim that the video shows that Officer Oster is front of, or outside of, the doorway when he requests permission to enter.[110] Lege disputes defendants' view of the video. At his deposition, while he initially claimed that Officer Oster had both feet inside the apartment when he requested permission to enter, he later changed that testimony, saying instead that Officer Oster was in "mid-stride" when he asked permission.[111] In his opposition brief, Lege claims that certain details in the video,

_____

[110]Defendants' Motion for Summary Judgment at 9, Docket No. 39, and Defendant's Reply Brief in Support of Motion for Summary Judgment at 4, Docket No. 57.

[111]Exhibit A, Lege deposition at 3, 12, Defendants' Motion for Summary Judgement, Docket No. 39-1.

ORDER – Motion for Summary Judgment                                    - 19 -

which he does not specify, show that he is partway inside at the time he asks permission to enter.[112]

The body camera footage exhibits supplied by both parties in support of their respective positions show that neither party's characterization of the encounter is entirely accurate. Rather, the exhibits show that Officer Oster was in the doorway area when he asked Lege for permission to enter. The exhibits do not show that Lege is inside the apartment at this point. The exhibits show the location of the top of Officer Oster's body in relation to the rest of the doorway. They show that he is standing in the doorway, which is a public place, at the time he receives consent to enter.

Officer Oster's location when he sought Lege's consent is a material fact. There is some disagreement about his location; but the disagreement on that point is not a "genuine" dispute. No reasonable jury, presented with the exhibits now before the court, would find that Officer Oster entered Lege's apartment prior to securing Lege's consent for the entry. Officer Oster's initial entry into Lege's apartment did not violate the Fourth Amendment or 42 U.S.C. § 1983.

Plaintiff's arrest by Officers Cheatam and Oster took place after a second entry into Lege's apartment. Their second entry did not violate the Fourth Amendment or 42 U.S.C. § 1983. The body camera footage shows that after Officer Oster interviewed Lege, he told Lege that he didn't know yet what is going on and told Lege to "hang out" as he proceeded to exit the apartment. As he walked out the door, Lege told the officer that he can "keep that open," to which Officer Oster replied that he will leave it cracked. Thus, the footage shows that both parties knew that this investigation was not over and

---

[112]Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 10-13, Docket No. 51.

that Officer Oster was expected to return. The video shows that Lege knew Officer Oster was just going directly upstairs, to Boneta's apartment; as Officer Oster walked up the stairs, he instructed Lege to go inside. The footage shows that Officer Oster then returned to Lege's apartment less than two minutes later, and that Lege's apartment door is still open. Lege, who was standing inside his apartment near the doorway, saw Officer Oster standing outside the door. Officer Oster remained outside and informed Lege that he is waiting for his sergeant. After Officer Cheatam arrived and Officer Oster relayed Lege's story to him, Officer Cheatam initiated their entry to Lege's apartment. The video shows that they did not request consent for entry. Nor does it show that Lege ever withdrew his prior consent to entry.

Because Lege had already consented to Officer Oster's initial entry and because the video shows that both parties understood that his investigation was ongoing and that he would return after his initial exit, and because Lege never withdrew this consent, Officer Oster's subsequent reentry did not violate the Fourth Amendment. Under United States v. Rubio, 727 F.2d 786, 797 (9th Cir. 1983), this consent properly permitted Officer Cheatam's entry as well.

In consideration of the foregoing, defendants Oster and Cheatam are entitled to summary judgment on Lege's first claim.

      B.    Lege's Claim of Illegal Search

In his second claim, Lege contends that Officers Oster and Cheatam conducted an illegal warrantless search of the rooms in his apartment.[113] Moving for summary judgment on Lege's second claim, defendants argue that there was no search for the knife

---

[113]Amended Complaint at 14-16, ¶¶ 93-101, Docket No. 9.

which was seized.[114]  Based upon the facts which are set out above, the knife which was seized was in plain sight and Lege directed the officers to it.  Moreover, Lege invited the officers to search his apartment.[115]  The evidence before the court supports Officers Oster and Cheatam's contention that there was no search for the knife which was seized; and, to the extent the officers looked elsewhere in Lege's apartment, they had been invited to do so by Lege and they found nothing further of interest concerning plaintiff's arrest.

In consideration of the foregoing, defendants Oster and Cheatam are entitled to summary judgment on Lege's second claim.

### C.    Qualified Immunity

In their answer to plaintiff's amended complaint, Officers Oster and Cheatam assert the affirmative defense of qualified immunity as to Lege's first and second claims.[116]  Plaintiff Lege does not oppose the officers' claim of qualified immunity.   The defendants argue that, even if they erred, qualified immunity shields them from suit.[117]

In this case, neither Officer Oster nor Officer Cheatam violated Lege's constitutional right to be arrested in his residence only upon probable cause and only upon consent for the entry.  As a consequence, the court need not consider the officers' qualified immunity defense.

### D.    Probable Cause for Arrest of Lege

The question of whether or not Officers Oster and Cheatam had probable cause to arrest Lege is relevant to Lege's fourth claim of common law false arrest and to Lege's

---

[114]Defendants' Motion for Summary Judgement at 9, Docket No. 39.

[115]Exhibit 3, Officer Oster body camera footage at 5:58-6:03, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-3.

[116]Answer at 15, ¶ 2, Docket No. 22.

[117]Defendants' Motion for Summary Judgment at 12-15, Docket No. 39.

fifth claim for malicious prosecution against Officer Cheatam. Probable cause for Lege's arrest is also relevant to Lege's third claim based upon municipal and supervisory liability under <u>Monnell v. Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978).

In their summary judgment motion, defendants argue that Officers Cheatam and Oster had probable cause to arrest Lege for assault[118] and trespass.[119] They contend that they are entitled to summary judgment because there exists no genuine dispute of material fact on this issue and that, if the officers were mistaken in their probable cause determinations, they are entitled to qualified immunity as to any such mistake.[120]

Lege argues that Officers Cheatam and Oster did not have probable cause to arrest him for either assault or trespass because Boneta was not a trustworthy witness.[121] As to the assault claim, Lege argues there was no probable cause for arrest because Boneta was an untrustworthy witness whose claims regarding the assault and knife were not corroborated by any other witness.[122] As to the trespass claim, Lege argues that there was no probable cause for arrest because Officer Cheatam knowingly failed to interview an available witness with exculpatory information.[123] Lege does not address whether the

---

[118]Throughout their motion, defendants incorrectly state that Lege was arrested for fourth-degree assault. He is charged with third-degree assault in the complaint attached to Lege's opposition as Exhibit 6. Officer Cheatam also informs Lege that he is being arrested for third-degree assault at minute 21:23-21:26 of his body camera footage, attached to Lege's opposition as Exhibit 4.

[119]Defendants' Motion for Summary Judgment at 6, 10-12, Docket No. 39.

[120]<u>Id.</u> at 6, 14.

[121]Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 17-18, Docket No. 51.

[122]<u>Id.</u> at 17-24.

[123]<u>Id.</u> at 24-28.

ORDER – Motion for Summary Judgment                                          - 23 -

officers are entitled to qualified immunity for any mistake as to a probable cause determination.

"An arrest must be supported by probable cause." United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir. 1990). "[W]hether a reasonable officer could have believed probable cause . . . existed to justify a search or arrest is 'an essentially legal question' . . . [to] be determined by the district court." Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). To determine whether probable cause existed, the court must therefore inquire into the facts and circumstances within a police officer's knowledge. Id.

Police have probable cause to arrest when they possess "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1296 (9th Cir. 1988). "Probable cause 'is not a high bar.'" District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)). It requires just the "probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "Courts look to the totality of the circumstances known to the officers prior to any search conducted incident to the arrest." Del Vizo, 918 F.2d at 825-26 (quoting United States v. Potter, 895 F.2d 1231, 133-34 (9th Cir. 1990)). "It is essential to avoid hindsight analysis, i.e., to consider additional facts that became known only after the arrest was made." John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008).

When police have communicated amongst themselves, probable cause may rest upon their "collective knowledge." Del Vizo, 918 F.2d at 826 (quoting United States v. Bernard, 623 F.2d 551, 560-61 (9th Cir. 1979)). This includes no requirement regarding

ORDER – Motion for Summary Judgment                                          - 24 -

the content of the communication that one officer must make to another. United States v. Ramirez, 473 F.3d 1026, 1032, 1037 (9th Cir. 2007) (explaining that under the collective knowledge doctrine, or fellow officer rule, in order to determine if an investigatory stop, search, or arrest complied with the Fourth Amendment, the court looks to the collective knowledge of all of the officers involved in the investigation, even though all the information known to all the officers is not communicated to the officer who actually undertook the challenged action).

This means that when one officer knows facts constituting probable cause sufficient to justify action under an exception to the warrant requirement, and that officer communicates an appropriate order or request, another officer can conduct a warrantless search, stop, or arrest without violating the Fourth Amendment. Ramirez, 473 F.3d at 1037.

1.   False Arrest for Assault and Trespass

The record shows that Officers Cheatam and Oster arrested Lege for first-degree criminal trespass under Alaska Statute (AS) § 11.46.320(a)(2) and felony third-degree assault under AS § 11.41.220(a)(1)(A).[124]

In Alaska, a person commits the tort of false arrest when that person (1) exercises restraint on someone's freedom (2) without proper legal authority. Hazen v. Municipality of Anchorage, 718 P.2d 456, 461 (Alaska 1986). Under AS § 12.25.030(a)(3), "a peace officer without a warrant may arrest a person . . . (3) when a felony has in fact been committed, and the person making the arrest has reasonable cause for believing the person to have committed it." This means that "a peace officer, without a warrant, may arrest a

---

[124]Exhibit 6, charging documents and police reports at 2-4, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Docket No. 51-6.

person for a felony when the officer has probable cause to believe that a felony has been committed and probable cause to believe that the person committed it." Shorty v. State, 214 P.3d 374, 379 (Alaska Ct. App. 2009) (quoting McCoy v. State, 491 P.2d 127, 130 (Alaska 1971)). Defendants assert that they are entitled to summary judgment on this claim, and Lege does not address, much less dispute, this argument.

The totality of circumstances as detailed in the above background material shows that the officers had probable cause to arrest Lege for both offenses based on the testimony they heard and the physical evidence they observed. They had probable cause to arrest Lege for trespass under AS § 11.46.320(a)(2) because they heard testimony from two witnesses, W.P. and V.P., that he had come into their living room without permission. While Lege told Officer Oster that a female in a dark shirt let him inside the second of the two doors leading into Boneta's apartment, this does not negate a finding of probable cause. Even if a member of Boneta's family had let Lege into their living room, Boneta told Officer Cheatam that upon discovering Lege in his apartment, he told him to leave, that Lege ignored his command, and that he and his wife, Mary, had to push him out of the apartment. Mary corroborated this testimony when she also told Officer Cheatam that she pushed Lege out of her apartment, as did V.P., when she told him that she saw her parents pushing Lege out of the apartment. Lege himself further corroborated their testimony that he overstayed any perceived welcome when he told Offer Oster that he argued with Boneta and Mary, after they had exited their bedroom. The record shows that the officers not only heard information indicating that Lege had entered the apartment without permission, but that he failed to leave after being told to do so, such that he remained inside unlawfully. The officers had probable cause to believe that Lege had committed first-degree criminal trespass.

Likewise, they had probable cause to arrest Lege for assault under AS § 11.41.220(a)(1)(A) because Boneta told Officer Cheatam that Lege had threatened him and tried to stab him with a knife. He explained that he was afraid of the knife. He told Officer Cheatam that it looked like a kitchen knife, as opposed to a buck or hunting knife, and that it was probably the same one that Lege had wielded in a prior incident. His story was again corroborated by Lege's statements, first when he told the 911 operator that he had an X-Acto knife on his person, then when he told Officer Oster that he had his work knife and identified its location in his apartment, and finally when he told Officer Cheatam that he did have kitchen knives elsewhere in his apartment. Boneta's story was further corroborated when Officer Oster showed the knife to Officer Cheatam, who was then near the exterior doorway. Even if Boneta himself is not the most credible witness, his story was corroborated by Lege's admission to having a knife and by the officers' subsequent discovery of a knife, even if the knife seized did not exactly match the description Boneta provided.

While evidence contradicting just part of a witness' allegations undermines the witness' reliability and can defeat probable cause, the disparity between Boneta's description of Lege's knife and that which the officers later seized does not negate probable cause, especially given that Lege admitted to having kitchen knives, which would have more closely matched Boneta's description but which the officers did not seize, and given that Boneta also suggested that the knife might have been the same as one that Lege had wielded in a prior incident. This constitutes sufficient evidence from which the officers could have concluded that there was a reasonable probability that Lege had assaulted Boneta with a knife.

ORDER – Motion for Summary Judgment - 27 -

The officers had probable cause to believe that Lege had committed both first-degree trespass and third-degree assault. Because the officers had probable cause to believe that Lege had committed third-degree assault, a felony under AS § 11.41.220(e), they had proper legal authority to effect Lege's arrest under AS § 12.25.030(a)(3) and Shorty, 214 P.3d at 379. Defendants Officers Cheatam and Oster are entitled to summary judgment on plaintiff's fourth claim of false arrest.

       2.      <u>Malicious Prosecution</u>

Malicious prosecution is comprised of the following elements: (1) malice, (2) want of probable cause, and (3) termination of the proceedings in favor of the plaintiff. <u>Hazen</u>, 718 P.2d at 461. Defendant Cheatam asserts that he is entitled to summary judgment on this claim, and Lege does not address this argument.[125] Regardless, Lege's fifth claim for malicious prosecution fails on the merits because Officer Cheatam had probable cause to arrest Lege for both offenses. And Lege has offered no evidence that Officer Cheatam acted with malice when he charged Lege with either offense. Officer Cheatam has averred that he has no malice toward Lege and that he did not act out of malice. The allegations in Lege's pleadings alone are insufficient to survive a motion for summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). <u>See also</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-18 (1982) ("[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery."). Officer Cheatam is entitled to summary judgment on Lege's fifth (malicious prosecution) claim because Lege has failed to make a sufficient showing of malice, which is an essential element of Lege's case and for which he bears the burden of proof. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

---

[125]Defendants' Motion for Summary Judgment at 15-16, Docket No. 39.

ORDER – Motion for Summary Judgment             - 28 -

3.    Third Claim for Relief – Monnell Liability

We return now to Lege's third claim for relief against the City of Ketchikan, based upon alleged Monnell liability.  For his third claim, Lege alleges that:

> Defendant City of Ketchikan, by and through its policy-makers, has knowingly created policies, practices and customs, including a failure to provide adequate training to its police officers, including the individual Defendants, regarding the police department's constitutional obligation to arrest an individual only with probable cause, and to refrain from entering an individual's home for the purpose of arrest, without first having an arrest warrant, consent of the homeowner, or exigent circumstances. . . .[126]

If, as Lege contends, the City of Ketchikan had policies, practices, or customs authorizing warrantless searches without consent or arrests without probable cause or entry into a person's home for purposes of making an arrest without consent, it is entirely clear that such alleged policies, practices, or customs were not at play here.  Officers Oster and Cheatam had plaintiff's consent to seize his work knife and search his apartment.  Officers Oster and Cheatam had consent to enter Lege's apartment.  They arrested him based upon probable cause.

Because there was no Fourth Amendment or 42 U.S.C. § 1983 violation as to plaintiff's arrest, there is no Monnell liability as to defendant City of Ketchikan.  The City's motion for summary judgment is granted as to Lege's third claim.

E.    Assault and Battery Against Boneta

Plaintiff's fifth claim asserts common law malicious prosecution against defendant Boneta.[127]  Plaintiff's sixth claim asserts common law assault and battery against

---

126Amended Complaint at 16, ¶ 104, Docket No. 9.

127Id. at 18-21, ¶¶ 116-135.

Case 5:20-cv-00006-HRH   Document 59   Filed 12/16/21   Page 29 of 30

defendant Boneta.[128]  The court has jurisdiction of these state law claims by virtue of 28 U.S.C. § 1367(a) – supplemental jurisdiction.  Pursuant to Section 1367(c), the court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."

As set out above, the court has granted the defendants other than Boneta summary judgment, which will result in the dismissal of plaintiff's first through third claims over which the court has original jurisdiction.  Accordingly, the court exercises its discretion to decline supplemental jurisdiction over plaintiff's fifth and sixth claims against Boneta.

<u>Conclusion</u>

The motion for summary judgment of defendants Oster, Cheatam, and City of Ketchikan is granted as to Lege's first, second, third, fourth, and fifth claims.  Lege's motion for discovery[129] is denied as moot.

The clerk of court shall enter judgment dismissing the first through fifth claims of plaintiff's amended complaint with prejudice as to defendants Oster and Cheatam and defendant City of Ketchikan.  The fifth and sixth claims of the plaintiff's amended complaint are dismissed without prejudice as to defendant Boneta.

DATED at Anchorage, Alaska, this  16th  day of December, 2021.


/s/   H. Russel Holland
United States District Judge

---

[128]<u>Id.</u> at 21-22, ¶¶ 136-148.

[129]Docket No. 32.